IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30409 |
| | ) | (Chapter 11) |
| H5 TRANSPORT, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

### **H5 TRANSPORT, LLC SUBCHAPTER V PLAN OF REORGANIZATION**

Comes now H5 Transport, LLC ("H5 Transport" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and Section 1193 of Title 11 of the United States Code, and provides the following plan of reorganization (the "Plan") herein:

### Background for Cases Filed Under Subchapter V

a. **Description and History of the Debtor's Business.**

H5 Transport is a North Dakota limited liability company formed in 2018 to operate a regional and over-the-road freight transportation business. The Debtor maintains its principal place of business in Oakes, North Dakota. Prior to September 16, 2025 (the "Petition Date"), H5 Transport operated a small fleet of tractors and trailers, utilizing a combination of company-employed drivers and independent owner-operators under lease agreements.

The Debtor's core business involves the transportation of general freight for a mix of direct shipper customers and national freight brokerages, with operations focused primarily in the Upper Midwest and extending into other domestic long-haul lanes. Loads are typically tendered under written rate confirmations or master transportation agreements, with payment terms commonly ranging from thirty to sixty days following delivery. To support its operations, the Debtor implemented dispatch, compliance, and safety systems to coordinate equipment and monitor driver hours in compliance with applicable Department of Transportation regulations.

As is typical in the trucking industry, the Debtor's largest operating expenses include fuel, driver compensation, equipment leases and financing, maintenance and repairs, licensing and registration, and multiple lines of commercial insurance. Because these expenses must be paid on a near real-time basis while receivables are collected over longer periods, the Debtor entered into a factoring relationship with TBK Bank, SSB d/b/a Triumph Business Capital, a commercial finance company specializing in transportation receivables. Under that facility, the Debtor regularly assigned qualifying accounts receivable and received cash advances, which were used to fund ongoing operational expenses. The factoring facility became a critical component of the Debtor's working capital strategy and enabled the company to serve larger shippers with extended payment terms.

In the years preceding the Petition Date, the Debtor's operations were significantly impacted by adverse macroeconomic conditions within the freight industry. Beginning in 2023, the trucking sector experienced a prolonged downturn, often referred to as the "freight recession," characterized by depressed spot market rates, reduced load volumes, and increased pressure from brokers and shippers to lower rates and accept extended terms. At the same time, the Debtor faced

1

rising fuel prices, insurance premiums, and maintenance costs associated with its aging fleet. These pressures led to margin compression and increased reliance on the factoring facility for liquidity. Over time, higher reserve requirements, reduced advance rates, and increased fees under the factoring arrangement further constrained the Debtor's ability to deploy cash toward fixed operating costs.

Operational challenges also intensified. The Debtor experienced equipment breakdowns and out-of-service periods that reduced the availability of revenue-generating units. Disputes with certain equipment lessors and secured creditors diverted management resources and incurred legal costs. Despite these challenges, the Debtor remained committed to operating responsibly, focused on its most profitable lanes, and worked constructively with creditors, vendors, and its factor to manage cash flow and payment schedules.

By the third quarter of 2025, the cumulative effect of sustained rate pressure, volatile operating costs, aging equipment, and tightened access to credit left the Debtor unable to remain current on all of its obligations while continuing as a going concern. Collection efforts by trade creditors escalated, certain secured parties threatened repossession or turnover actions, and the Debtor faced a mounting risk of forced liquidation. Such a liquidation would have disrupted service to longstanding customers, eliminated jobs, and significantly reduced potential recoveries for creditors.

Accordingly, the Debtor filed a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of North Dakota (Case No. 25-30409). Since the Petition Date, the Debtor has continued to operate as a debtor-in-possession, obtained authority to continue its factoring arrangement, and preserved operations while formulating this Plan of Reorganization. The Debtor believes that confirmation of this Plan will allow it to adjust its capital structure, stabilize cash flow, and maximize recoveries for its creditors while preserving going-concern value and employment.

b. **Liquidation Analysis & Secured Claim Valuation**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as they would in a Chapter 7 liquidation. The Debtor entered bankruptcy with assets valued at $315,951.00 and liabilities totaling $2,029,764.10. Substantially all of the Debtor's assets—including cash, accounts receivable, vehicles and trailers, and certain funds held in trust—serve as collateral for one or more secured creditors. In a Chapter 7 liquidation, there would be little to no funds available for distribution to unsecured creditors. Absent a negotiated carve-out, it is unclear whether a Chapter 7 trustee would have an economic incentive to liquidate assets solely for the benefit of secured creditors.

The Debtor holds litigation rights in *H5 Transport, LLC v. Wallwork Truck Center, Inc., et al.*, Civil No. 3:24-cv-00045-ARS, which is currently pending before the United States District Court for the District of North Dakota. The complaint asserts various causes of action arising from allegedly defective repairs and related commercial conduct and includes a stated demand of approximately $95,000.00. It is believed that these litigation rights are subject to the lien and/or assignment rights of Starion Bank, pursuant to prepetition loan documents and applicable Uniform Commercial Code filings. The Debtor intends to actively prosecute the *Wallwork* litigation post-confirmation and believes that a recovery may be achieved for the benefit of the estate.

2

However, in the context of a Chapter 7 liquidation analysis, assigning a fixed value to this litigation claim is not appropriate. Litigation rights are inherently uncertain assets. A Chapter 7 trustee would be required to evaluate not only the legal merits of the claims, but also the viability of any defenses, the availability of insurance or assets for collection, and the net recovery after attorneys' fees and litigation costs are considered. This uncertainty is further compounded by the fact that the defendants have asserted counterclaims, which may give rise to setoff or recoupment rights that could reduce or eliminate any net recovery to the estate. While the Debtor believes the litigation has merit and is committed to pursuing it in good faith, the combination of litigation risk, collectability concerns, and potential offsets renders its liquidation value speculative. Accordingly, and solely for the purpose of evaluating recoveries in a hypothetical Chapter 7 scenario, the Debtor assigns no fixed liquidation value to the *Wallwork* litigation claim. This should not be construed as a waiver of, or concession regarding, the merits or potential recovery of the claim, but rather as an acknowledgment of the inherent uncertainty that would confront a trustee in a liquidation context.

Collectively, these circumstances place the liquidation value of the Debtor's estate, after accounting for assets subject to the liens of secured creditors, at either $0.00 or, at most, a *de minimis* amount in excess of $0.00. In addition, the liquidation of any such de minimis asset, if any exist, would likely require a Chapter 7 trustee to incur legal fees and other administrative costs, along with a statutory commission for the trustee's services. These expenses would further reduce or eliminate any potential recovery available to unsecured creditors. By contrast, the Plan proposes to pay unsecured creditors—including any allowed priority and administrative claims—an aggregate of $201,756.69, a sum that substantially exceeds what those creditors would receive in a Chapter 7 liquidation.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also demonstrate that it will have sufficient cash flow over the life of the Plan to make all required payments. Forward-looking financial projections are attached hereto as Exhibit A. These projections show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code), remaining after payment of administrative expenses, for the duration of the period set forth in § 1191(c)(2).

Importantly, the projections attached hereto as Exhibit A reflect earnings before interest, taxes, depreciation, and amortization sufficient to support the Debtor's ability to make monthly plan payments, meet administrative obligations, and operate on a sustainable basis post-confirmation. The projections are grounded in the Debtor's historical performance, current cost structure, and conservative revenue assumptions. They do not rely on speculative growth models or nonrecurring income events.

While the freight transportation industry remains subject to external pressures—including fluctuations in diesel fuel prices, maintenance expenses, and variations in broker-driven demand—the Debtor's streamlined operating model, stable receivables, and post-petition cost adjustments provide a credible and feasible basis for continued operations and Plan compliance. The Debtor is committed to making all payments proposed in the Plan and does not anticipate the need for any further reorganization.

3

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.**     **Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

| | |
|---|---|
| The Plan provides for: | 2 classes of secured claims; and |
| | 2 class of general unsecured claims |

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.**     **Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of TBK Bank, SSB d/b/a Triumph. |
| **Section 2.02** | **Class 2** | The secured portion of the claim of Starion Bank. |
| **Section 2.03** | **Class 3** | The unsecured claim of Great West Casualty Company. |
| **Section 2.04** | **Class 4** | All general unsecured claims not subsumed in Class 3. |
| **Section 2.05** | **Class Identification** | A schedule each class and its constituent creditors is appended hereto as Exhibit B. The total amount of claims in each class is based on timely filed proof of claim, as of the date of this Plan, and reflects all such claims prior to the filing of any objections. |

Class 1: $39,710.43

Class 2: $305,340.00

Class 3: $26,833.06

Class 4: $ 1,512,831.12

**Article 3.**     **Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |

| | | |
|---|---|---|
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code shall be paid in full, either (i) upon such other terms as may be agreed to in writing between the Debtor and the holder of such claim, or (ii) absent such agreement, in accordance with § 1191(e) of the Bankruptcy Code over the life of the Plan. All professionals, including the Debtor's counsel and the Subchapter V Trustee, shall file applications for compensation within thirty (30) days of the Effective Date, and any such claim allowed by the Court shall be paid first from any retainer held by the professional and, to the extent necessary, directly by the Debtor within five (5) business days after entry of a final order approving such fees, unless otherwise agreed by the holder, with all such payments to be made during the life of this Plan. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not later than September 16, 2030, in accordance with § 1129(a)(9)(C) and § 1191(e) of the Bankruptcy Code. The Debtor is aware of one such claim, filed by the Internal Revenue Service in the amount of $576.69. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

**Article 4.**     **Treatment of Claims and Interest Under the Plan**

| **Class** | **Impairment** | **Treatment** |
|---|---|---|
| Class 1 – TBK Bank, SSB d/b/a Triumph | Unimpaired | Class 1 consists of the secured claim of TBK Bank, SSB d/b/a Triumph (TBK Bank), in the amount of $39,710.43. This claim shall be paid in equal monthly installments over sixty (60) months, with interest at 8.00% per annum, beginning on the Effective Date. |

5

| | | |
|---|---|---|
| Class 2 – Secured Claim of Starion Bank. | Impaired | This class consists of the secured portion of the claim of Starion Bank. This claim will be paid in equal monthly installment over a sixty-month term, commencing on the Effective date, with interest accruing at 8 % per annum. Net proceeds from collateral sales and applicable litigation, further described in Article 7, shall be applied toward the balance of this claim. |
| Class 3 – Great West Casualty Company | Unimpaired | This class consists of the unsecured claim of Great West Casualty Company. This class is unimpaired, as the Plan does not modify the terms of the pre-petition insurance policy or the timing of payments. The Debtor shall continue to perform its obligations under the policy in the ordinary course of business, including timely payment of premiums or other amounts due, in accordance with the original agreement and to the extent enforceable under non-bankruptcy law. The claim of Great West Casualty Company shall be deemed contractually current as of the Effective Date of this Plan. |
| Class 4 – General unsecured creditors | Impaired | This class consists of all allowed non-priority unsecured claims, including the unsecured portion of the claim of Starion Bank. |

**Article 5.      Allowance and Disallowance of Claims**

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Time to Dispute Claims**. The Debtor anticipates objecting to at least one claim in this case. Any such claim objection must be filed by the Debtor within six months from the effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Article 6.        Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor assumes the executory contracts and unexpired leases set forth below, pursuant to § 365 of the Bankruptcy Code. These include: (i) the commercial insurance agreement with Great West Casualty Company; (ii) the office lease agreement with Matt Hill; (iii) the subscription agreement with Motive Technologies, Inc. for fleet tracking, telematics services, hardware leasing, and monthly data services; and (iv) the Factoring and Security Agreement with TBK Bank, as amended and renewed.

**Section 6.02   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof, expressly rejecting the executory contract with Wallwork Financial Corp.

**Article 7.        Means for Implementation of the Plan**

The Debtor will continue operating its commercial freight transportation business to generate the revenue necessary to implement this Plan. Since the Petition Date, the Debtor has reduced overhead, streamlined its fleet, and focused operations on lanes and contracts that yield more stable and predictable income. While industry conditions remain competitive, H5 Transport believes the projected Plan payments are feasible and is committed to performing as required to achieve the "fresh start" contemplated by the bankruptcy process.

To supplement operating cash flow, the Debtor intends to sell two trailers no longer required for its reduced fleet: (i) a 2014 Great Dane trailer with a vehicle identification number ending in 6345; and (ii) a 2014 Utility trailer with a vehicle identification number ending in 7312. These trailers are encumbered by liens held by Starion Bank, and their disposition is governed by a Forbearance Agreement dated January 1, 2025. Pursuant to that agreement, all net proceeds from the sale of these trailers shall be remitted to Starion Bank, up to the amount of its secured claim, and applied in the manner set forth in the agreement. Although TBK Bank holds a blanket post-petition security interest under the Final DIP Order, any lien it may assert in the trailer proceeds is subordinate to Starion Bank's prepetition lien and would attach only to any surplus remaining after Starion Bank has been paid in full. The Debtor anticipates completing the sales within twelve (12) months following the Effective Date.

The Debtor also holds a pending litigation claim in *H5 Transport, LLC v. Wallwork Truck Center, Inc., et al.*, Case No. 3:24-CV-00045-ARS, in the United States District Court for the District of North Dakota. The Debtor will continue to pursue this litigation post-confirmation, to

the extent it is not resolved prior to confirmation, with the goal of prosecuting the claim through to judgment and collection. Any proceeds recovered—whether through settlement, judgment, or otherwise—shall be treated as property of the estate and, after payment of attorneys' fees and litigation costs, shall be applied first to unpaid administrative expense claims and then in accordance with the distribution provisions of this Plan.

In sum, the Plan will be implemented through continued business operations, supplemented by the sale of non-essential equipment and the pursuit of litigation recoveries. Together, these funding sources provide a feasible and structured basis for full performance under Subchapter V.

**Article 8.     General Provisions**

**Section 8.01   Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02   Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03   Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04   Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06   Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full (though it is recognized this Plan only provides for one creditor class); and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.12   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court. The Subchapter V trustee shall continue to seek Court approval of all fees post-confirmation.

**Article 9.   Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the

last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in June 2029.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.    Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through January 1, 2029, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

    Respectfully Submitted,

    /s/ Christianna A. Cathcart
    Christianna A. Cathcart, Esq.
    THE DAKOTA BANKRUPTCY FIRM
    1630 1st Avenue N
    Suite B PMB 24
    Fargo, North Dakota 58102-4246
    christianna@dakotabankruptcy.com
    *Counsel for the Debtor*