IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: ) | Case No. 25-30409 |
| ) | (Chapter 11) |
| H5 TRANSPORT, LLC ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |

**H5 TRANSPORT, LLC FIRST AMENDED**
**<u>SUBCHAPTER V PLAN OF REORGANIZATION</u>**

Comes now H5 Transport, LLC ("H5 Transport" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and Section 1190 of Title 11 of the United States Code, and provides the following first amended plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

a. **Description and History of the Debtor's Business.**

H5 Transport, a Florida limited liability company founded in 2018 and headquartered in Oakes, North Dakota, provides regional and long-haul freight services throughout the Upper Midwest and beyond. Prior to September 16, 2025 (the "Petition Date"), H5 Transport operated a small, efficient fleet of tractors and trailers, utilizing a blend of company drivers and leased owner-operators. The Debtor's principal operations center on the transportation of general freight for direct shippers and national brokerages pursuant to written agreements, with payment terms generally ranging from thirty to sixty days. The Debtor has consistently invested in advanced dispatch, safety, and monitoring systems to ensure regulatory compliance and operational efficiency, and has maintained strict adherence to Department of Transportation guidelines.

As is typical in the trucking industry, the Debtor's primary operating expenses include fuel, driver wages, equipment leases and financing, maintenance and repairs, licensing and registration, and insurance. Given the prompt payment required for these obligations, contrasted with customers' extended payment cycles, the Debtor entered into a factoring arrangement with TBK Bank, SSB d/b/a Triumph ("Triumph"), a leading transportation finance company. This arrangement provided critical liquidity for daily operations and enabled the Debtor to serve larger shippers operating on extended payment terms. Factoring consequently became a central component of the Debtor's working capital strategy.

Beginning in 2023 and continuing through 2025, the freight sector experienced a prolonged downturn, commonly referred to as a "freight recession." During this period, H5 Transport encountered persistently low spot rates, diminished load volumes, and mounting pressure from brokers and shippers to accept lower rates and extended payment terms. Concurrently, the Debtor faced escalating costs for fuel, insurance, and maintenance, particularly as its fleet aged. These adverse market conditions and increased expenditures materially compressed margins and strained cash flow, progressively impairing the Debtor's ability to meet its fixed obligations.

Operational challenges further compounded these financial pressures. Equipment failures and unplanned maintenance reduced the availability of revenue-generating trucks, thereby directly affecting service capacity and revenue. Moreover, disputes with certain equipment lessors and secured creditors diverted management's attention and increased legal and administrative expenses. Despite these circumstances, the Debtor focused on profitable routes, implemented cost reductions, and maintained open communication with creditors and vendors to manage cash flow and payments.

By the third quarter of 2025, the confluence of sustained rate pressure, unpredictable operating costs, aging equipment, and restricted access to working capital rendered it impossible for the Debtor to meet all financial obligations or continue regular operations. Collection efforts by trade creditors intensified, and certain secured parties threatened repossession or turnover of assets. The Debtor consequently faced an imminent risk of forced liquidation, which would have resulted in job losses, service disruptions for customers, and diminished recoveries for creditors.

Faced with these circumstances, the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 in the United States Bankruptcy Court for the District of North Dakota. Since the Petition Date, the Debtor has continued to operate as debtor-in-possession and has prepared this Plan of Reorganization. The Debtor submits that confirmation of the Plan will stabilize its financial position, maximize recoveries for creditors, and preserve jobs and enterprise value. The Debtor remains committed to the successful execution of this Plan and the restoration of long-term viability for the benefit of all stakeholders.

b. **Liquidation Analysis & Secured Claim Valuation**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such parties would receive in a hypothetical Chapter 7 liquidation. The Debtor entered bankruptcy with $315,951.00 in assets, all of which serve as collateral securing the claims of three secured creditors. Consequently, any Chapter 7 liquidation proceeds would be applied first to administrative expenses and then to the secured creditors' claims, leaving no meaningful value available for distribution to other creditors. Absent a carve-out agreement, it is not clear that a trustee would even endeavor to liquidate assets solely for the benefit of secured parties.

The Debtor scheduled $175,451.00 in cash and cash equivalents, consisting of $1,450.00 in accounts receivable and $163,001.00 in funds held in trust for the benefit of the estate. Following the Petition Date, these trust funds were transferred into a savings account. Subsequently, due to the loss of factoring early in the case, approximately $27,001.00 was drawn, resulting in a savings account balance of $136,000.00. Accordingly, the Debtor's total cash and cash equivalents equal $148,450.00. In a Chapter 7 liquidation scenario, cash and cash equivalents are, by their nature, immediately available for distribution and, consistent with prevailing bankruptcy practice, are valued at par.

The Debtor's scheduled non-cash assets included $500.00 in office furniture and equipment and $140,000.00 in vehicles and trailers. In a Chapter 7 context, a trustee would be compelled to liquidate these assets under forced-sale conditions, with limited marketing time and material disposition costs (including transport, storage, and broker or auctioneer fees). For these

2

reasons, the Debtor has applied an 85% discount to office furniture and equipment, for an estimated liquidation value of $75.00, and a 35% discount to vehicles and trailers, resulting in an estimated liquidation value of $91,000.00.

The Debtor has also scheduled litigation rights against Wallwork Truck Center, Inc., et al., Case No. 3:24-CV-00045-ARS, pending in the United States District Court for the District of North Dakota (the "Wallwork Litigation"), as an asset of unliquidated value. Although the Wallwork Litigation seeks damages of approximately $95,000.00, the Debtor has assigned no value to this claim for purposes of the liquidation analysis. This conservative approach is justified by the significant uncertainty inherent in litigation, including unpredictable outcomes, potential defenses and counterclaims, collectability issues, and the impact of attorneys' fees and other costs. In a Chapter 7 liquidation, a trustee would be required to evaluate the merits of the claim, assess available defenses, consider collectability, and determine the net recovery after deducting litigation expenses. While the Debtor intends to pursue the claim in good faith and believes it has merit, the cumulative risks render any estimate of recovery highly speculative. This position is not intended as a waiver or concession regarding the claim's underlying merit or potential value, but rather reflects the uncertainty inherent in the liquidation process.

Collectively, these figures place the liquidation value of the Debtor's estate at $239,525.00. In the event of a Chapter 7 liquidation, if a trustee were permitted to sell *all* of these assets, the trustee would be entitled to a commission of $15,226.25. 11 U.S.C. §326(a). It is reasonably surmised a trustee would also incur at least $15,000.00 in legal fees and related professional expenses as part of an effort to liquidate the estate. This would result in a net proceeds available for distribution of $209,298.75. Because the allowed secured claims against the estate exceed this amount, no funds would be available for distribution to general unsecured creditors in Chapter 7 liquidation. By contrast, under this Plan holders of allowed general unsecured claims will receive distributions totaling approximately $33,329.67, thereby satisfying the best-interests-of-creditors requirement.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also demonstrate that it will generate sufficient cash flow throughout the life of the Plan to make all required payments. The Debtor's forward-looking financial projections, attached hereto Exhibit A, provide a detailed analysis of projected disposable income (as defined in § 1191(d)), net of administrative expenses, for the duration of the Plan. These projections demonstrate that the Debtor will generate sufficient cash flow to make all required payments under the Plan and meet administrative obligations. The projections are based on historical operating results, a stable receivables portfolio, the current cost structure, and conservative revenue assumptions, without relying on speculative growth or extraordinary, nonrecurring income. Despite ongoing industry challenges—including volatility in fuel costs, fluctuating maintenance expenses, and variable demand—the Debtor's streamlined operations and cost reductions provide a solid foundation for sustainable post-confirmation performance. Accordingly, the Debtor submits that the Plan is feasible under 11 U.S.C. § 1191(c)(3), and that confirmation is not likely to be followed by liquidation or the need for further financial reorganization.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.   Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:   3 classes of secured claims; and

2 classes of general unsecured claims

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.   Classification of Claims and Interests**

**Section 2.01   Class 1**   The secured claim of TBK Bank, SSB d/b/a Triumph.

**Section 2.02   Class 2**   The secured portion of the claim of Starion Bank.

**Section 2.03   Class 3**   The secured portion of US SBA-Office of District Counsel

**Section 2.04   Class 4**   The unsecured claim of Great West Casualty Company

**Section 2.05   Class 5**   All general unsecured claims not subsumed in Class 4.

**Section 2.06   Class Identification**   A schedule of each class and its constituent creditors is appended hereto as Exhibit B. The total amount of claims in each class is based on timely filed proof of claim, as of the date of this Plan, as adjusted by any bifurcation of secured claims pursuant to §506 of the Bankruptcy Code as provided in this Plan, and reflects all such claims prior to the filing of any objections.

Class 1: $39,710.43

Class 2: $305,340.00

Class 3: $1,347.33

Class 4: $26,833.06

Class 5: $ 1,490,580.09, including, without limitation, (i) the unsecured claim of Starion Bank in the amount of

4

$1,163,963.57, the unsecured portion of US SBA claim in the amount of $306,452.67, and other general unsecured claims totaling $20,163.85.

**Article 3.   Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code shall be paid in full, either (i) upon such other terms as may be agreed to in writing between the Debtor and the holder of such claim, or (ii) absent such agreement, in accordance with § 1191(e) of the Bankruptcy Code over the life of the Plan.<br><br>As of the date of this Plan, the Debtor estimates that total unpaid administrative expense claims, including professional fees and the Subchapter V Trustee's compensation, will amount to approximately $8,800, subject to Court approval. All professionals, including the Debtor's counsel and the Subchapter V Trustee, shall file applications for compensation within thirty (30) days of the Effective Date, and any such claim allowed by the Court shall be paid first from any retainer held by the professional and, to the extent necessary, directly by the Debtor within five (5) business days after entry of a final order approving such fees, unless otherwise agreed by the holder, with all such payments to be made during the life of this Plan. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not later than September 16, 2030, in accordance with § 1129(a)(9)(C) and § 1191(e) of the Bankruptcy Code. The Debtor expressly reserves the right to object to the allowance of any such claim, whether filed or amended. To the extent a priority tax claim is allowed, such claim shall be paid in full throughout the term of this Plan. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

5

**Article 4.**     **Treatment of Claims and Interest Under the Plan**

| **Class** | **Impairment** |
|---|---|
| Class 1 – TBK Bank, SSB d/b/a Triumph | Unimpaired |

This Class consists of the secured claim of TBK Bank, SSB d/b/a Triumph ("Triumph") in the amount of $39,710.43. This Class is unimpaired, inasmuch as the Plan does not alter Triumph's contractual rights, which are governed by the Factoring and Security Agreement entered into between the Debtor and Triumph, as amended and supplemented by the Post-Petition Chapter 11 Bankruptcy Rider (collectively, the "Post-Petition Agreements").

The Post-Petition Agreements were approved by the Court pursuant to the Final DIP Financing Order entered on October 16, 2025 (DE# 53) and are assumed under this Plan as set forth in Article 6. Triumph's claim shall be paid and administered in accordance with the Post-Petition Agreements and the Final DIP Financing Order, including all provisions governing reserves, collections, and proceeds.

The Debtor shall continue to pay this claim in the ordinary course of business through the regular factoring process, including disbursements made from reserve funds, in accordance with the terms of the Post-Petition Agreements. This Class shall be deemed current as of the Effective Date, unless otherwise agreed by the parties or ordered by the Court.

| Class 2 – Secured Claim of Starion Bank. | Impaired |
|---|---|

This Class consists of the secured portion of Starion Bank's ("Starion") claim, arising from prepetition loan obligations secured by valid, perfected, and unavoidable liens on certain assets of the Debtor, including, without limitation, vehicles, trailers, equipment, and related proceeds. As of the Petition Date, and after accounting for all senior liens, the Debtor asserts that the value of the collateral securing Starion's claim is $305,340.00, which amount constitutes Starion's allowed secured claim. Any portion of Starion's claim in excess of this amount shall be treated as a general unsecured claim in Class 5.

In partial satisfaction of its allowed secured claim, the Debtor shall make a lump sum payment of $85,000.00 to Starion within the first month following the Effective Date. Upon receipt of this payment, Starion shall deliver to the Debtor good and marketable title to the 2019 Chevrolet and 2022 Aero Trailer, free and clear of its liens. The remaining balance of Starion's allowed secured claim shall be paid in equal monthly installments over the remaining fifty-nine (59) months of the Plan term, commencing in the second month following the Effective Date, with interest accruing on the unpaid balance at the rate of nine percent (9%) per annum, amortized over the Plan term.

Starion shall retain all valid, perfected, and unavoidable prepetition liens and security interests securing its allowed secured claim until such claim is paid in full. Such liens shall continue post-confirmation and shall attach to all collateral securing Starion's claim as of the Petition Date, including, without limitation, vehicles, trailers, equipment, and all related proceeds, products, replacements, substitutions, and insurance proceeds. To the extent Starion holds a valid, perfected

6

lien under applicable nonbankruptcy law in the proceeds of the Wallwork Litigation, such lien is preserved and shall continue post-confirmation until Starion's allowed secured claim is paid in full.

While any portion of Starion's allowed secured claim remains unpaid, all net proceeds realized by the Debtor from the sale, disposition, or liquidation of collateral, and from the Wallwork Litigation, to the extent such proceeds are subject to Starion's valid, perfected, and unavoidable liens under applicable nonbankruptcy law, shall be applied dollar for dollar to reduce the outstanding balance of Starion's allowed secured claim. If such payments and proceeds fully satisfy Starion's allowed secured claim, no further payments shall be required under this Class, and Starion shall release its liens in accordance with the applicable loan documents or upon reasonable documentation evidencing satisfaction. Any proceeds not subject to a perfected lien in favor of Starion, or remaining after Starion's allowed secured claim has been paid in full, shall be applied in accordance with this Plan, including pro rata distribution to holders of allowed Class 5 general unsecured claims.

Class 3 – US SBA                                                                                     Impaired

Class 3 consists of the secured portion of the claim of the U.S. Small Business Administration ("SBA"). As of the Petition Date, SBA asserted a secured claim in the amount of $164,950.00. This Class is impaired, inasmuch as the Plan bifurcates SBA's claim pursuant to § 506 of the Bankruptcy Code, based on the value of the Debtor's assets and the extent to which such assets are encumbered by senior secured claims.

After accounting for all prior liens, the Debtor asserts that only $1,347.33 in value remains available to secure SBA's claim. Accordingly, that amount constitutes the allowed secured portion of SBA's claim for purposes of this Plan. Any portion of SBA's claim not secured by the value of the Debtor's assets shall be treated as a general unsecured claim in Class 5.

The allowed secured portion of SBA's claim shall be paid in equal monthly installments over the sixty-month term of the Plan, commencing on the Effective Date, with interest accruing on the unpaid balance at the rate of eight percent (8%) per annum, amortized over the Plan term. SBA shall retain its lien on the collateral securing its claim to the extent necessary to secure payment of the allowed secured amount, until such amount is paid in full in cash.

Class 4 – Great West Casualty Company                                       Unimpaired

This Class consists of the unsecured claim of Great West Casualty Company. This Class is unimpaired, inasmuch as the Plan does not alter the contractual terms governing repayment of this obligation. The claim shall be paid in accordance with the original terms of the applicable insurance policy, to the extent enforceable under non-bankruptcy law. The Debtor shall continue making monthly payments directly to Great West Casualty Company in the ordinary course, and the claim shall be deemed current as of the Effective Date, unless otherwise agreed by the parties or modified by order of the Court.

Class 5 – General Unsecured                                                              Impaired

Class 5 consists of all allowed general unsecured claims not otherwise classified under this Plan, including the unsecured portions of the claims of Starion and the U.S. SBA, as well as any other timely filed and allowed general unsecured claims. This Class is impaired, inasmuch as the Plan provides for less than full payment of such claims.

Beginning in the first month following the Effective Date, the Debtor shall allocate to Class 5 any remaining available funds for that month, after satisfaction of all required payments to senior Classes under the Plan. Such funds shall be held in reserve and distributed annually, with the initial distribution to occur no later than the end of the twelfth month following the Effective Date, and each subsequent distribution to occur annually thereafter. All distributions to Class 5 shall be made on a pro rata basis among holders of allowed Class 5 claims.

To the extent the Debtor recovers net proceeds from the Wallwork Litigation that are not subject to a valid, perfected lien in favor of Starion, or that remain after Starion's allowed secured claim has been paid in full, such proceeds shall be allocated to the Class 5 distribution pool and distributed pro rata among holders of allowed general unsecured claims.

All funds otherwise available for distribution to this Class under this Plan shall first be applied to any unpaid allowed administrative expense claims, in accordance with Article 3. If no funds remain following such payments, no distribution shall be made to this Class, and any unpaid portion of allowed Class 5 claims shall be discharged upon completion of the Plan and entry of a discharge order.

**Article 5.    Allowance and Disallowance of Claims**

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Time to Dispute Claims**. The Debtor anticipates objecting to at least one claim in this case. Any such claim objection must be filed by the Debtor within six months from the Effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Section 5.05   Bifurcation of Claims.** For avoidance of doubt, Claim No. 6 held by US SBA-Office of District Counsel, shall be deemed bifurcated pursuant to § 506 of the Bankruptcy Code as follows: (i) a secured claim in the amount of $1,347.33 treated in Class 3 of this Plan; and (ii)

8

an unsecured deficiency claim for any remaining balance, treated in Class 5. Such bifurcation and classification shall be binding upon the Effective Date, unless otherwise ordered by the Court.

**Article 6.     Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01    Assumption.** The Debtor assumes the executory contracts and unexpired leases set forth below, pursuant to § 365 of the Bankruptcy Code. These include: (i) the commercial insurance agreement with Great West Casualty Company; (ii) the office lease agreement with Matt Hill; (iii) the subscription agreement with Motive Technologies, Inc. for fleet tracking, telematics services, hardware leasing, and monthly data services; and (iv) the Factoring and Security Agreement dated June 16, 2021, between Triumph and the Debtor, as amended and supplemented by the Post-Petition Chapter 11 Rider (collectively, the "Post-Petition Agreements"), approved by the Court's Final DIP Financing Order entered October 16, 2025 (the "Final DIP Financing Order," as found at DE #53).

**Section 6.02    Specific Post-Confirmation Terms Governing Triumph.** Pursuant to the Final DIP Financing Order, within which all capitalized terms not herein separately defined have been given their meaning, Triumph granted, among other things, a valid, binding, enforceable and perfected first and senior ownership interest in all Purchased Accounts, free and clear of all liens, claims, and encumbrances of any other party-in-interest in this case, as well as a first and senior priority security interest and lien in all of the Debtor's property and assets acquired or arising on and after the Petition Date. The Debtor has agreed to preserve and to grant to Triumph, each of the following rights post-petition.

(i)     All existing and hereafter arising rights and interests granted to Triumph, and all monetary obligations and non-monetary obligations owed and hereafter owing to Triumph by the Debtor under and in respect to the Factoring Agreement and all rights granted to Triumph under the Final DIP Financing Order: (a) shall be and are hereby assumed, ratified and acknowledged, and approved without any modification or further Court approval, and (b) shall at all times be fully preserved, and shall remain in full force and effect post-confirmation and fully binding on the Debtor and all parties-in-interest of the Debtor.

(ii)    Upon entry of a Confirmation Order, the Debtor and Triumph will continue to operate, post-confirmation, pursuant to the Factoring Agreement.

(iii)   The Final DIP Financing Order shall remain in full force and effect, post-confirmation, however, notwithstanding, post-confirmation Triumph shall not be required to comply with certain provisions specific to the post-petition bankruptcy, including, but not necessarily limited to, section 22 (procedure for reimbursement of post-confirmation attorney's fees incurred by Triumph and reimbursement of any post-confirmation attorney's fees and costs incurred by Triumph shall be governed post-confirmation solely by the terms of the Factoring Agreement), section 12 (related to any requirement that Triumph seek stay relief post-confirmation prior to exercising its rights after an Event of Default under the Factoring Agreement and cure period) and section 5 (applicable to any notice and cure period after upon an event of default).

(iv)    After confirmation of the Plan, the following interests granted to Triumph shall be fully preserved post-confirmation to secure any now existing and hereafter arising monetary

9

obligations and non-monetary obligations owing to Triumph by the Debtor arising under the Factoring Agreement: (a) the first priority ownership interest in all Purchased Accounts (as defined by the Factoring Agreement) and (b) first priority security interest, Liens and interests recognized or granted to Triumph in any collateral (as defined in the Factoring Agreement and/or the Final DIP Financing Order), and (c) all rights granted to Triumph in respect to any supporting obligations (as such term is defined in the Uniform Commercial Code), including any guarantor.

(v) In the event the Debtor, and/or any Guarantor defaults under the Factoring Agreement and/or the Plan, Triumph shall be entitled to exercise and enforce all rights and remedies, under the and in respect to the Factoring Agreement, the Plan, and/or under applicable state law, free of any injunction under 11 U.S.C. § 524(a), or otherwise.

(vi) The Bankruptcy Court will retain non-exclusive, concurrent jurisdiction together with any state or federal court sitting in Dallas County, Texas or, if none, any court located in the State of Texas nearest the location of Triumph's chief executive office ("Acceptable Forums"), to enforce to the terms of the Plan and the Factoring Agreement. The Debtor and any Triumph Guarantor each waive any right to contest the Acceptable Forum's subject matter jurisdiction or personal jurisdiction over the parties. The Debtor agrees that the Acceptable Forums are convenient to it and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue.

(vii) Notwithstanding anything to the contrary, in the event of an express conflict between the terms of the Factoring and Final DIP Financing Order on the one hand, and any plan, including this Plan, the Confirmation Order, or any authorizing amendment or modification to the Plan, on the other hand, the Factoring and the Final DIP Financing Order will control.

(viii) After the Confirmation Date or Effective Date, whichever is earliest, the Debtor, on the one hand, and Triumph, on the other hand, shall be entitled by written agreement to modify the terms of the Factoring Agreement without having to obtain authorization from the Bankruptcy Court or any order of Court authorizing a modification of the Plan. Nothing contained in this Plan shall affect Triumph's rights to exercise any of Triumph's rights under the Factoring Agreement, or any other agreement between the parties regarding the Triumph Factoring Agreement.

(ix) The Debtor acknowledges and agrees that the Debtor will not seek the entry of an order in the Bankruptcy Case that modifies, enjoins, impairs, interferes with, or adversely impacts any of Triumph's rights and/or the Debtor's monetary and non-monetary obligations to Triumph under and with respect to the Factoring Agreement and the Final DIP Financing Order except expressly as provided herein.

(x) The following provisions contained in this Plan to the extent inconsistent with this section, are inapplicable to Triumph, including section 3.02 (i.e., administrative expense claims), section 8.05 (default), 8.08 (controlling effect), section 8.10 (retention of jurisdiction), section 8.12 (professional fees), and section 9 (discharge).

Upon Plan confirmation, the Debtor and Triumph will continue their business under the Factoring Agreement, with the Debtor selling Accounts to Triumph, which upon purchase

constitute Purchased Accounts, in exchange for purchase price advances pursuant to the Factoring Agreement.

**Section 6.03   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof, expressly rejecting the executory contract with Wallwork Financial Corp.

**Article 7.       Means for Implementation of the Plan**

The Debtor shall maintain and operate its commercial freight transportation business to generate the revenue required to implement this Plan. Since the Petition Date, the Debtor has reduced overhead, optimized its fleet, and focused on routes and contracts that offer stable and predictable income. While industry conditions remain competitive, H5 Transport believes that its ongoing operations will provide adequate cash flow to fulfill its obligations under the Plan and achieve the fresh start intended by the bankruptcy process.

To supplement operating cash flow, the Debtor intends to sell two trailers that are no longer necessary for its optimized fleet: (i) a 2014 Great Dane trailer with a vehicle identification number ending in 6345, and (ii) a 2014 Utility trailer with a vehicle identification number ending in 7312. Both trailers are subject to prepetition perfected liens held by Starion Bank, and their sale is governed by a Forbearance Agreement dated January 1, 2025. All net proceeds from these sales shall be remitted to Starion Bank and applied strictly in accordance with Article 4 of this Plan, including reduction of Starion Bank's allowed secured claim.

Triumph holds a blanket post-petition security interest pursuant to the Final DIP Financing Order and a prepetition security interest in certain assets of the Debtor. Any lien or security interest of Triumph in the trailers or their proceeds is subordinate to Starion's prepetition perfected liens. Accordingly, any security interest of Triumph shall attach only to surplus proceeds remaining after Starion Bank's allowed secured claim has been paid in full, as provided in this Plan. The Debtor anticipates completing the sale of the trailers within twelve (12) months after the Effective Date.

The Debtor shall continue to pursue the Wallwork Litigation, pending in the United States District Court for the District of North Dakota, following confirmation unless resolved sooner, with the objective of obtaining a recovery for the estate. Any proceeds recovered from the Wallwork Litigation shall constitute property of the estate and shall be applied strictly in accordance with Article 4 of this Plan, including the lien retention and distribution provisions governing Class 2 and Class 5.

The Debtor is authorized to take all actions necessary or appropriate to implement this Plan, including executing documents, making payments, and taking any other steps required to consummate the transactions contemplated herein.

In summary, the Plan shall be implemented through ongoing business operations, the sale of non-essential equipment, and the pursuit of litigation claims. Collectively, these funding sources provide a feasible and orderly means for consummation of the Plan under Subchapter V.

11

**Article 8.     General Provisions**

**Section 8.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02    Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05    Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06    Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07    Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08    Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09    Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the

University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.12   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court. The Subchapter V trustee shall continue to seek Court approval of all fees post-confirmation.

**Article 9.      Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in December 2030.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.** **Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through December 30, 2030, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

Respectfully Submitted,

Dated: December 23, 2025

/s/ Christianna A. Cathcart
Christianna A. Cathcart, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
christianna@dakotabankruptcy.com
*Counsel for the Debtor*

/s/ *L~ H-L*
Lonnie Helgerson
H5 Transport, LLC
Managing Member

14