IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30409 |
| | ) | (Chapter 11) |
| H5 TRANSPORT, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## H5 TRANSPORT, LLC THIRD AMENDED
## <u>SUBCHAPTER V PLAN OF REORGANIZATION</u>

Comes now H5 Transport, LLC ("H5 Transport" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and Section 1190 of Title 11 of the United States Code (the "Bankruptcy Code"), and provides the following third amended plan of reorganization (the "Plan") herein:

### Background for Cases Filed Under Subchapter V

### a.  Description and History of the Debtor's Business.

H5 Transport, LLC is a Florida limited liability company headquartered in Oakes, North Dakota, specializing in regional and long-haul transportation of dry goods. The Debtor primarily provides full truckload ("FTL") and less-than-truckload ("LTL") shipping services, with core routes connecting the Dakotas to Illinois, as well as additional routes serving other Midwestern destinations and select West Coast markets. To promote operational efficiency and maintain compliance with federal and state transportation regulations, the Debtor utilizes advanced dispatch, safety, and fleet-management systems.

Trucking operations inherently involve substantial upfront expenditures—such as fuel, driver compensation, equipment leases, maintenance, licensing, and insurance—which typically must be paid well before customer invoices are collected. To effectively manage this timing gap and support ordinary-course operations, the Debtor entered into a factoring agreement with TBK Bank, SSB d/b/a Triumph ("Triumph"), under which Triumph advanced approximately ninety percent (97%) of eligible receivables upon invoicing. This arrangement was essential to improving liquidity and facilitating continued operations despite extended customer payment cycles.

Beginning in 2023, the Debtor faced increasingly adverse market conditions characterized by reduced freight volumes, declining spot rates, and extended payment terms. Concurrently, operating expenses—particularly fuel, insurance, and repair and maintenance costs associated with aging equipment—increased significantly. These higher costs, exacerbated by frequent equipment breakdowns and unplanned maintenance, further constrained fleet availability and revenue generation. Despite proactive operational adjustments, cost-reduction initiatives, and the strategic prioritization of profitable routes, these persistent financial pressures severely compromised liquidity and ultimately impaired the Debtor's financial stability.

By the third quarter of 2025, escalating disputes with equipment lessors and secured

1

creditors, intensified collection efforts, and imminent threats of asset repossession placed the Debtor at serious risk of forced liquidation. To preserve its business operations, protect going-concern value, and safeguard creditor interests, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 16, 2025 (the "Petition Date"). Since the Petition Date, the Debtor has continued to operate its business and manage its assets as a debtor-in-possession.

### b. Liquidation Analysis & Secured Claim Valuation

To confirm the Plan, the Court must determine that each holder of an impaired claim or interest that does not accept the Plan will receive or retain, under the Plan and on account of such claim or interest, property of a value, as of the Effective Date, that is not less than the value such holder would receive in a hypothetical chapter 7 liquidation of the Debtor. See 11 U.S.C. § 1129(a)(7), as incorporated by 11 U.S.C. § 1191(b).

The Debtor's liquidation analysis, attached hereto as Exhibit A (the "Liquidation Analysis"), reflects total estate assets with an aggregate value of approximately $337,541.00. This amount represents a reduction from the initially scheduled total of $364,541.00, primarily attributable to the Debtor's post-petition use of approximately $27,000.00 following the termination of factoring services early in this case.

After applying realistic liquidation discounts consistent with forced-sale conditions, the Liquidation Analysis estimates a net liquidation value of approximately $271,108.50. From this amount, estimated chapter 7 administrative expenses—including statutory trustee commissions pursuant to 11 U.S.C. § 326(a), trustee professional fees, costs related to asset disposition, insurance, storage, wind-down expenses, and final accounting costs—totaling approximately $32,305.43 would be deducted.

After accounting for these administrative expenses, approximately $238,803.07 would remain available for distribution to secured creditors. This amount is substantially insufficient to satisfy the aggregate allowed secured claims of approximately $562,010.84. Consequently, in a hypothetical chapter 7 liquidation, no funds would be available for distribution to general unsecured creditors. In contrast, under the Plan, holders of allowed general unsecured claims are projected to receive aggregate distributions totaling approximately $54,280.38, representing a materially greater recovery than would be available to such creditors in a hypothetical chapter 7 liquidation.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

To confirm the Plan, the Debtor must also demonstrate that it will generate sufficient cash flow over the life of the Plan to make all required payments. The Debtor's forward-looking financial projections, attached hereto as Exhibit B (the "Financial Projections"), provide a detailed analysis of projected disposable income (as defined in 11 U.S.C. § 1191(d)), after payment of administrative expenses, for the duration of the Plan. The Financial Projections indicate that the Debtor will generate sufficient cash flow to make all required payments under the Plan and to satisfy administrative obligations as they come due.

The Financial Projections are grounded in the Debtor's historical financial and operating performance, current receivables portfolio, existing cost structure, and conservative revenue assumptions. The projections also reflect anticipated proceeds from asset sales expressly contemplated by the Plan, but do not rely on speculative growth or extraordinary revenue beyond those identified transactions. Despite ongoing industry challenges—including volatility in fuel costs, fluctuating maintenance expenses, and variable demand—the Debtor streamlined operations and cost-reduction measures provide a reasonable foundation for sustainable post-confirmation performance. Accordingly, the Debtor submits that this Plan is feasible within the meaning of 11 U.S.C. § 1191(c)(3) and that confirmation is not likely to be followed by liquidation or the need for further reorganization.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.        Summary**

This Plan, under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:        Two classes of secured claims; and

One class of general unsecured claims.

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.        Classification of Claims and Interests**

**Section 2.01   Class 1**        The secured claim of TBK Bank, SSB d/b/a Triumph.

**Section 2.02   Class 2**        The secured claim of Starion Bank.

**Section 2.03   Class 3**        All general unsecured claims.

**Article 3.        Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code shall be paid in full, either (i) upon such other terms as may be agreed to in writing between the Debtor and the holder of such claim, |

3

or (ii) absent such agreement, in accordance with § 1191(e) of the Bankruptcy Code over the life of the Plan.

As of the date of this Plan, the Debtor estimates that total unpaid administrative expense claims, including professional fees and the Subchapter V Trustee's compensation, will amount to approximately $30,500.00, subject to Court approval. All professionals, including the Debtor's counsel and the Subchapter V Trustee, shall file applications for compensation within thirty (30) days of the Effective Date. Any such administrative expense claim allowed by the Court shall be paid first from any retainer held by the professional and, to the extent necessary, directly by the Debtor within five (5) business days after entry of a final order approving such fees, unless otherwise agreed by the holder, with all such payments to be made during the life of this Plan.

**Section 3.03   Priority Tax Claims**

Each holder of a priority tax claim shall be paid in full in accordance with § 1129(a)(9)(C) of the Bankruptcy Code, as incorporated by § 1191(e), through payments made over the term of this Plan and concluding not later than five years after the Petition Date. The Debtor expressly reserves the right to object to the allowance of any such claim, whether filed or amended. To the extent a priority tax claim is allowed, such claim shall be paid in full throughout the term of this Plan.

As of the date of this Plan, the Internal Revenue Service has filed a proof of claim in the amount of $576.69, asserting an unsecured priority claim based on estimated 2025 tax liabilities for which returns have not yet been filed and payment is not yet due. The Debtor disputes that any priority tax obligation will ultimately be owed for the relevant period and does not anticipate any additional priority tax claims arising during the pendency of this case or over the term of the Plan.

**Section 3.04   Statutory Fees**

There are no statutory fees due in this case.

**Section 3.05   Prospective Quarterly Fees**

There are no prospective quarterly fees that will be due in this case.

**Article 4.      Treatment of Claims and Interest Under the Plan**

Except as otherwise expressly provided in this Plan, the treatment of Claims under this Article is based on: (i) the amount and priority of each Claim as reflected in the Debtor's schedules

or as set forth in a timely filed proof of claim, subject to the claims-allowance process; and (ii) to the extent applicable, the value of any collateral securing such Claim as determined pursuant to 11 U.S.C. § 506(a). The Debtor's estimates of liquidation values and recoveries under a hypothetical chapter 7 case are summarized in the Liquidation Analysis attached hereto as Exhibit A. Unless otherwise expressly provided herein, including with respect to any consensual treatment of secured Claims or assumed executory contracts, each holder of an allowed Secured Claim shall retain the liens securing such Claim until payment in full of such allowed Secured Claim in accordance with this Plan, at which time such liens shall be released.

**Class 1 – TBK Bank, SSB d/b/a Triumph (Unimpaired)**

This Class includes the secured claim of TBK Bank, SSB d/b/a Triumph ("Triumph"), in the amount of $39,710.43, as reflected in Triumph's timely filed proof of claim. This amount represents the Debtor's net prepetition obligations under the factoring and security agreements as of the Petition Date, after application of collections and reserve balances, and excludes any post-petition advances, fees, costs, or professional expenses.

Triumph's prepetition claim is secured by (i) an ownership interest in accounts purchased by Triumph pursuant to the Factoring and Security Agreement ("Purchased Accounts"), and (ii) a valid, perfected, first-priority security interest in substantially all other assets of the Debtor, including, without limitation, accounts, deposit accounts, equipment, inventory, general intangibles, and all proceeds thereof, as more fully described in the Final Order Approving Debtor-in-Possession Financing entered on October 15, 2025 (DE #53) (the "Final DIP Financing Order").

This Class is unimpaired. The Plan does not alter Triumph's contractual rights under the Factoring and Security Agreement, as amended by the Post-Petition Chapter 11 Bankruptcy Rider, nor does it modify Triumph's rights under the Final DIP Financing Order. The Debtor intends to continue factoring receivables post-confirmation in the ordinary course of business, and payments to Triumph shall continue to be made through the ongoing factoring process, including the application of collections and reserve mechanics, in accordance with those agreements. For the avoidance of doubt, Triumph is not paid through fixed monthly Plan payments, and no traditional interest rate applies to this Class; the economic cost of the relationship is governed by the volume-based factoring fee and pricing structure set forth in the Factoring Agreement.

Any obligations arising in favor of Triumph on or after the Petition Date—including purchase price advances, reserves, factoring fees, costs, and attorneys' fees authorized under the Final DIP Financing Order and the Factoring and Security Agreement (collectively, the "Post-Petition Obligations")—are not claims treated under this Plan and shall be paid in full in the ordinary course of business in accordance with such agreements and orders. The Plan does not modify, impair, or discharge any Post-Petition Obligations. Triumph shall retain its ownership interests, liens, and security interests until all obligations under the Factoring and Security Agreement and the Final DIP Financing Order have been fully and indefeasibly satisfied. Upon such satisfaction, all interests shall be released in accordance with the applicable agreements and orders of the Court. As of the Effective Date, Triumph's prepetition secured claim shall be deemed current.

The specific post-confirmation rights and protections afforded to Triumph are further set forth in Section 6.02 of this Plan, which supplements this treatment and is incorporated herein by reference.

**Class 2 – Secured Claim of Starion Bank (Impaired)**

This Class consists of the secured claim held by Starion Bank ("Starion"), arising from prepetition loan obligations and secured by substantially all assets of the Debtor, including vehicles, trailers, equipment, inventory, accounts, deposit accounts, general intangibles, watercraft, motors, related accessories, and all proceeds thereof, as evidenced by recorded UCC financing statements. Starion has filed a proof of claim asserting a total amount of $1,521,313.98, of which $357,350.41 is asserted as secured. Pursuant to 11 U.S.C. § 506(a), and based on the Debtor's valuation of the collateral securing Starion's claim—after deducting the senior lien held by Triumph in the amount of $39,710.43—Starion is entitled to an allowed secured claim of $297,830.57. The balance of Starion's claim will be treated as a general unsecured claim in Class 3.

In full and final satisfaction of Starion's allowed secured claim, the Debtor shall pay Starion the principal sum of $297,830.57, together with interest accruing at nine percent (9%) per annum, in accordance with the payment terms of this Plan and the amortization schedule attached hereto as Exhibit C (the "Amortization Schedule"). The Amortization Schedule accounts for the accrual and capitalization of interest on Starion's allowed secured claim from the Petition Date up to the start of Plan payments, a period during which no payments were made on the Class 2 claim.

Without limiting the foregoing, payments on account of Starion's allowed secured claim shall include: (i) an initial lump-sum payment of $85,000.00 within thirty (30) days after the Effective Date (Plan Month 1), upon receipt of which Starion shall release its liens on one 2019 Chevrolet 2500 High Country and one 2022 Aero Trailer bumper-hitch trailer (collectively, the "Released Vehicles"); and (ii) subsequent monthly installment payments commencing in the month following the initial $85,000.00 payment and continuing thereafter, with the amount and timing of each installment as set forth in the Amortization Schedule and reflected in the Financial Projections.

With respect to the Debtor's 2022 Sea Pro 228 DLX Bay, 2021 Suzuki DF200ATXW3 motor, and 2021 Continental A245OB Trailer (collectively, the "Sea Pro Collateral"), the Debtor anticipates that Lonnie Helgerson will continue to make monthly payments of $744.99 under Note ***9843 through October 20, 2031, the maturity date, at which time all remaining principal and interest will be due. In the event such payments are not made for any reason, the Plan shall require surrender of the Sea Pro Collateral to Starion, and Starion shall be entitled to exercise its rights and remedies under applicable nonbankruptcy law with respect thereto. The Sea Pro Collateral, the exercise of any right or remedy against Starion, and the sale proceeds retained by Starion shall not reduce Debtor's payment obligations under this Plan. Any deficiency arising from such surrender shall be treated as a general unsecured claim in Class 3.

Except as to the Released Vehicles, the Sea Pro Collateral (to the extent surrendered), and, upon sale, any additional collateral to the extent of net sale proceeds applied to Starion's claim as further described in Article 7 of this Plan, Starion shall retain its valid, perfected, and unavoidable liens on the Debtor's remaining collateral securing the Class 2 claim until its allowed secured claim has been paid in full in accordance with this Plan, at which time all such liens shall be released.

**Class 3 – General Unsecured (Impaired)**

Class 3 consists of all allowed general unsecured claims not otherwise classified under this

Plan, currently estimated at approximately $1,588,467.24 in the aggregate. Such claims include, without limitation: (i) the unsecured portion of Starion's claim in the amount of $1,223,483.41; (ii) the unsecured claim of the United States Small Business Administration (the "SBA") in the amount of $307,800.00; and (iii) other general unsecured claims, including DeWitt LLP in the amount of $16,274.14; American Express National Bank in the amount of $15,406.32; Concentric LLC in the amount of $8,633.63; Penseke Truck Leasing Co. in the amount of $4,739.56; Oaks Truck Trailer in the amount of $3,426.97; Capital One, N.A. in the amount of $3,260.18; Valley Tire, LLC in the amount of $1,387.35; 129 Truck Shop in the amount of $1,225.66; A.W. Diesel Service in the amount of $1,057.35; Revolutionary in the amount of $1,015.22; Indeed in the amount of $495.00; and ELM in the amount of $262.45.

Holders of allowed Class 3 claims shall receive distributions from the Debtor's available cash flow. Based on the Financial Projections, the aggregate amount to be distributed to Class 3 over the sixty (60) month term of the Plan is $54,280.38, resulting in an estimated recovery of approximately 3.4% of allowed Class 3 claims.

The Debtor shall make distributions to holders of allowed Class 3 claims in the amounts and timing set forth in the Financial Projections, as follows: $27,329.17 in Plan Month 1; $9,102.60 in Plan Month 12; $2,259.69 in each of Plan Months 24, 36, and 48; and $11,042.22 in Plan Month 60. Each such distribution shall be made on or before the last day of the applicable Plan Month, unless otherwise agreed by the affected parties or ordered by the Court.

Each distribution shall be made on a pro rata basis among holders of allowed Class 3 claims, based on the proportion that each holder's allowed claim bears to the aggregate amount of all allowed Class 3 claims as of the applicable distribution date. The projected allocation of such distribution is reflected on the Class 3 pro rata distribution schedule attached hereto as Exhibit D (the "Pro Rata Distribution Schedule").

## Article 5.    Allowance and Disallowance of Claims

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Time to Dispute Claims**. The Debtor anticipates objecting to at least one claim in this case. Any such claim objection must be filed by the Debtor within six months from the Effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Section 5.05  Bifurcation of Claims.** For the avoidance of doubt, pursuant to 11 U.S.C. § 506(a), certain prepetition loan obligations are bifurcated for purposes of classification and treatment under this Plan based on the value of the collateral securing such claims. Claim No. 6 filed by the SBA shall be treated under this Plan as a general unsecured claim in its entirety and classified in Class 3, with no allowed secured portion. Starion's prepetition claim shall be bifurcated into (i) an allowed secured claim in the amount set forth in the Class 2 treatment, and (ii) an unsecured deficiency claim classified in Class 3 in the amount set forth in the Class 3 treatment. The foregoing bifurcation and classification of the SBA's and Starion's claims shall be binding as of the Effective Date, unless otherwise ordered by the Court.

**Article 6.  Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01  Assumption.** The Debtor assumes the executory contracts and unexpired leases set forth below, pursuant to 11 U.S.C. § 365. These include: (i) the commercial insurance agreement with Great West Casualty Company; (ii) the office lease agreement with Matt Hill; (iii) the subscription agreement with Motive Technologies, Inc. for fleet tracking, telematics services, hardware leasing, and monthly data services; and (iv) the Factoring and Security Agreement dated June 16, 2021, between Triumph  and the Debtor, as amended and supplemented by the Post-Petition Chapter 11 Rider (collectively, the "Post-Petition Agreements"), approved by the Court's Final DIP Financing Order entered October 16, 2025 (the "Final DIP Financing Order," as found at DE #53). As of the Effective Date, the Debtor represents that no monetary or non-monetary defaults exist under the Assumed Contracts, and no cure amounts are required to be paid to assume such contracts. To the extent any counterparty to an Assumed Contract disputes the absence of a default or asserts a cure amount, the Bankruptcy Court shall resolve such dispute, and the Debtor shall not be deemed in default of such contract pending resolution of the dispute.

**Section 6.02  Specific Post-Confirmation Terms Governing Triumph.** Pursuant to the Final DIP Financing Order, within which all capitalized terms not herein separately defined have been given their meaning, Triumph granted, among other things, a valid, binding, enforceable and perfected first and senior ownership interest in all Purchased Accounts, free and clear of all liens, claims, and encumbrances of any other party-in-interest in this case, as well as a first and senior priority security interest and lien in all of the Debtor's property and assets acquired or arising on and after the Petition Date. The Debtor has agreed to preserve and to grant to Triumph, each of the following rights post-petition.

(i)  All existing and hereafter arising rights and interests granted to Triumph, and all monetary obligations and non-monetary obligations owed and hereafter owing to Triumph by the Debtor under and in respect to the Factoring Agreement and all rights granted to Triumph under the Final DIP Financing Order: (a) shall be and are hereby assumed, ratified and acknowledged, and approved without any modification or further Court approval, and (b) shall at all times be fully preserved, and shall remain in full force and effect post-confirmation and fully binding on the Debtor and all parties-in-interest of the Debtor.

(ii)  Upon entry of a Confirmation Order, the Debtor and Triumph will continue to operate, post-confirmation, pursuant to the Factoring Agreement.

8

(iii)    The Final DIP Financing Order shall remain in full force and effect, post-confirmation, however, notwithstanding, post-confirmation Triumph shall not be required to comply with certain provisions specific to the post-petition bankruptcy, including, but not necessarily limited to, section 22 (procedure for reimbursement of post-confirmation attorney's fees incurred by Triumph and reimbursement of any post-confirmation attorney's fees and costs incurred by Triumph shall be governed post-confirmation solely by the terms of the Factoring Agreement), section 12 (related to any requirement that Triumph seek stay relief post-confirmation before exercising its rights after an Event of Default under the Factoring Agreement and cure period) and section 5 (applicable to any notice and cure period after upon an event of default).

(iv)    After confirmation of the Plan, the following interests granted to Triumph shall be fully preserved post-confirmation to secure any now existing and hereafter arising monetary obligations and non-monetary obligations owing to Triumph by the Debtor arising under the Factoring Agreement: (a) the priority ownership interest in all Purchased Accounts (as defined by the Factoring Agreement) and (b) priority security interest, Liens and interests recognized or granted to Triumph in any collateral (as defined in the Factoring Agreement and/or the Final DIP Financing Order), and (c) all rights granted to Triumph in respect to any supporting obligations (as such term is defined in the Uniform Commercial Code), including any guarantor.

(v)    In the event the Debtor, and/or any Guarantor defaults under the Factoring Agreement and/or the Plan, Triumph shall be entitled to exercise and enforce all rights and remedies, under the and in respect to the Factoring Agreement, the Plan, and/or under applicable state law, free of any injunction under 11 U.S.C. § 524(a), or otherwise.

(vi)    The Bankruptcy Court shall retain non-exclusive jurisdiction to interpret, implement, and enforce this Plan, the Confirmation Order, and the assumption and performance of the Facotring Agreement. Nothing herein shall be construed to modify, limit, or waive any forum-selection, jurisdictional, or venue provisions contained in the Factoring Agreement, which shall remain enforceable according to the terms outside the context of Plan enforcement, to the extent permitted by applicable non-bankruptcy law.

(vii)    Notwithstanding anything to the contrary, in the event of an express conflict between the terms of the Factoring and Final DIP Financing Order on the one hand, and any plan, including this Plan, the Confirmation Order, or any authorizing amendment or modification to the Plan, on the other hand, the Factoring and the Final DIP Financing Order will control.

(viii)    After the Confirmation Date or Effective Date, whichever is earlier, the Debtor, on the one hand, and Triumph, on the other hand, shall be entitled by written agreement to modify the terms of the Factoring Agreement without having to obtain authorization from the Bankruptcy Court or any order of the Court authorizing a modification of the Plan. Nothing contained in this Plan shall affect Triumph's rights to exercise any of Triumph's rights under the Factoring Agreement, or any other agreement between the parties regarding the Triumph Factoring Agreement.

(ix)    The Debtor acknowledges and agrees that the Debtor will not seek the entry of an order in the Bankruptcy Case that modifies, enjoins, impairs, interferes with, or adversely impacts

any of Triumph's rights and/or the Debtor's monetary and non-monetary obligations to Triumph under and with respect to the Factoring Agreement and the Final DIP Financing Order except expressly as provided herein.

(x)      The following provisions contained in this Plan, to the extent inconsistent with this section, are inapplicable to Triumph, including section 3.02 (i.e., administrative expense claims), section 8.05 (default), section 8.08 (controlling effect), section 8.10 (retention of jurisdiction), section 8.12 (professional fees), and section 9 (discharge).

Upon Plan confirmation, the Debtor and Triumph will continue their business under the Factoring Agreement, with the Debtor selling Accounts to Triumph, which, upon purchase, constitute Purchased Accounts, in exchange for purchase price advances pursuant to the Factoring Agreement.

**Section 6.03   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof, expressly rejecting the executory contract with Wallwork Financial Corp.

**Article 7.      Means for Implementation of the Plan**

The Debtor shall maintain and operate its commercial freight transportation business in the ordinary course to generate the revenue necessary to implement this Plan. Since the Petition Date, the Debtor has reduced overhead, optimized its fleet, and focused on routes and customer relationships that generate stable, predictable income. The Plan further contemplates that the Debtor will continue to utilize its existing factoring agreement with Triumph as contemplated in Article 6.02 and Article 4 – Class 1 of this plan. While the freight industry remains competitive, the Debtor believes that its streamlined operations will generate sufficient cash flow to satisfy all obligations under the Plan and to achieve the fresh start contemplated by the Bankruptcy Code.

As a supplemental source of funding, the Debtor intends to sell certain non-essential equipment that is no longer required for its optimized fleet, including: (i) one 2014 Great Dane trailer with a vehicle identification number ending in 6345; and (ii) one 2014 Utility trailer with a vehicle identification number ending in 7312 (collectively, the "Trailers"). The Trailers are subject to valid, perfected prepetition liens held by Starion Bank ("Starion"). All net proceeds from the sale of the Trailers shall be remitted to Starion and applied in accordance with Article 4 of this Plan, including the reduction of Starion's allowed secured claim under Class 2. The Debtor anticipates completing the sale of the Trailers within approximately six (6) months following the Effective Date, as reflected by the "Asset Sale Proceeds" line item in Plan Month 6 of the Financial Projections.

Pursuant to the Final DIP Financing Order, Triumph holds postpetition security interests in certain assets of the Debtor. To the extent Triumph asserts any lien or security interest in the Trailers or their proceeds, such lien or security interest shall attach to the proceeds, if at all, subject to the terms of the Final DIP Financing Order and applicable non-bankruptcy law. Notwithstanding the foregoing, for purposes of this Plan, all net proceeds from the sale of the Trailers shall be remitted to Starion and applied first to reduce Starion's allowed secured claim under Class 2 in accordance with Article 4, with any remaining proceeds, if any, treated as additional collateral and

cash proceeds available to secure Triumph's claim.

The Debtor is authorized to take all actions necessary or appropriate to implement and consummate this Plan, including executing documents, consummating sales of assets, making payments, and taking such other actions as may be required or permitted under this Plan. As reflected in the Financial Projections, the Plan shall be implemented through a combination of ongoing business operations, continued use of postpetition receivables factoring, and the orderly disposition of non-essential equipment. Together, these measures provide a practical and coherent structure for fully implementing and consummating this Plan.

**Article 8.    Wallwork Litigation.**

Prior to the Petition Date, the Debtor commenced an action captioned *H5 Transport, LLC v. Wallwork Truck Center, Inc., et al.*, Case No. 3:24-cv-00045-ARS, pending in the United States District Court for the District of North Dakota (the "Wallwork Litigation"). The Wallwork Litigation arises from disputed prepetition vehicle lease and purchase transactions under a Motor Vehicles Master Lease and related agreements. The Debtor alleges, among other things, that a tractor was misrepresented as non-salvaged and free from prior accident damage, giving rise to claims for breach of contract, breach of express warranties, negligent and fraudulent misrepresentation, negligence, and related causes of action, with alleged damages in excess of $95,000.00.

Under this Plan, the Debtor shall not expend estate funds or incur postpetition obligations to prosecute or otherwise pursue the Wallwork Litigation, and the Financial Projections assume no recovery on account of such claims and no litigation reserve. Consistent with the Liquidation Analysis attached hereto as Exhibit A, no value is ascribed to the Wallwork Litigation in a hypothetical chapter 7 liquidation. The Debtor intends, within a reasonable time after the Effective Date, to dismiss or otherwise terminate the Wallwork Litigation. To the extent the Debtor nevertheless receives any proceeds on account of the Wallwork Litigation, whether by settlement, judgment, or otherwise, such proceeds shall constitute property available to fund this Plan and shall be applied in accordance with Article 4 of this Plan, including the lien-retention and distribution provisions applicable to the Class 2 secured claim and any other creditor holding a valid, perfected lien or security interest in such proceeds.

**Article 9.    General Provisions**

**Section 9.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 9.02    Effective Date.** The effective date of this Plan is the first business day following the 14th day after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 9.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

11

**Section 9.04   Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns, and/or receiver(s) of such entity.

**Section 9.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 9.06   Disbursing Agent.** There shall be no disbursing agent hereunder, and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 9.07   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 9.08   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 9.09   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of North Dakota School of Law, to be administered in a chartiable manner for the support of legal education and programs providing legal services or assistance to underserved individuals, as determined appropriate by the University.

**Section 9.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a

confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 9.11   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 9.12   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court. The Subchapter V trustee shall continue to seek Court approval of all fees post-confirmation.

**Article 10.   Discharge**

**Section 10.01 Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments.

**Section 10.02 Effect of Discharge.** This discharge will be effective against all creditors of the Debtor who are given notice of this bankruptcy case and are sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees, and receivers.

**Article 11.   Retention of Certain Assets; Notice of Substantial Consummation**

**Section 11.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through December 30, 2030, at which time said interest (should any remain) shall revest in the Debtor.

**Section 11.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

Respectfully Submitted,

Dated: April 30, 2026

/s/ Christianna A. Cathcart
Christianna A. Cathcart, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
christianna@dakotabankruptcy.com
*Counsel for the Debtor*


/s/ Lonnie Helgerson
Lonnie Helgerson
Managing Member

14